**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 08-100 (RJL)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PATRICIA ELIZABETH GONZALEZ,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S CONSOLIDATED MEMORANDUM  IN AID OF**
**SENTENCING AND MOTION FOR DOWNWARD DEPARTURE**

The United States of America, by and through its counsel, the United States Attorney for

the District of Columbia, hereby submits this consolidated memorandum in aid of sentencing and

motion for a downward departure under the United States Sentencing Guidelines ("U.S.S.G."),

Section 5K1.1.  As discussed below, the government moves this Court to apply the advisory

Sentencing Guidelines set forth in the Presentence Investigation Report (total offense level 19)

and, based on defendant's substantial assistance to the government, moves under Section 5K1.1

for a downward departure of two levels for a total offense level 17.  Accordingly, the government

respectfully requests this Court to impose a sentence that includes a 24-month period of

incarceration - the bottom of the guideline range.

I.    **FACTUAL BACKGROUND**

On January 9, 2008, agents from the Federal Bureau of Investigation ("FBI") approached

defendant near her place of employment, the Georgetown branch of the D.C. Department of

Motor Vehicles ("DMV").  She had finished her shift as a legal instrument examiner where her

duties included, among other things, processing applications submitted by individuals seeking to

obtain D.C. driver's licenses and identification cards.  Defendant was unaware that the FBI and

the D.C. Office of the Inspector General ("OIG") had been monitoring her activities for many

months.  During their surveillance, FBI and OIG agents had uncovered substantial evidence

which led them to conclude that defendant had been issuing D.C. driver's licenses and

identification cards to numerous individuals who were either ineligible under DMV's established

guidelines or failed to meet the testing requirements.  FBI agents asked defendant if she would be

willing to talk to them.  Without hesitation, defendant agreed to accompany them to FBI's

Washington Field Office where she spent several hours describing in detail her criminal conduct.

She expressed deep remorse.  At the conclusion of their meeting, defendant told the agents that

she was willing to cooperate fully in their investigation.

On May 19, 2008, defendant pled guilty to a one-count Information, charging her with

receipt of a bribe by a public official, in violation of 18 U.S.C. §§ 201(b)(2)(A) and (C).  Under

the terms of her plea agreement, defendant agreed to continue providing assistance upon the

government's request.  Her sentencing hearing is scheduled for August 14, 2008, at 2:00 p.m.

II.     **SENTENCING RECOMMENDATION**

    A.     Sentencing Guidelines

The Supreme Court has declared that, in terms of determining an appropriate sentence,

"[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be

the starting point and the initial benchmark."  Gall v. United States, 128 U.S. 586, 596 (2007).

Neither party objected to the Guidelines calculations utilized in the Presentence Investigation

Report ("PSR"), which correctly calculated defendant's adjusted offense level at 22.  See PSR at

¶29.  This includes the base offense level of 14, pursuant to U.S.S.G. Section 2C1.1(a)(1), and an

eight-level enhancement for more than one bribe, the receipt of more than $10,000, and

facilitating the obtaining of a government identification document, pursuant to U.S.S.G. Sections

2C1.1(b)(1), (2) and (4).[1]  Finally, the government agreed not to oppose a three-point reduction

for acceptance of responsibility, yielding a total offense level of 19.  See PSR at ¶32.  The PSR

also correctly calculated defendant's criminal history as Category I.  See PSR at ¶35.  Offense

level 19, with criminal history category of I, results in a sentencing range of 30 to 37 months.

See PSR at ¶65.  Considering defendant's substantial assistance to law enforcement, as detailed

in Government Exhibit 1 (filed under seal), the government respectfully requests the Court to

depart downward by two levels to an offense level 17, resulting in a sentencing range of 24 to 30

months.

     B.     Sentencing Factors Under 18 U.S.C. Section 3553

As the Court is well aware, the recommended sentence set forth in the Sentencing

Guidelines is but one factor this Court should consider in determining an appropriate sentence.

The Court should also consider the factors set forth in 18 U.S.C. Section 3553.[2]  As discussed

below, a consideration of these factors favors a sentence consistent with the Guidelines.

--------

[1] The plea agreement mistakenly added four, rather than two, levels for facilitating the obtaining of a government identification document.  See Plea Agreement, p.2.  As a result, the plea agreement incorrectly calculated defendant's adjusted offense level at 24.  Id.

[2] Section 3553(a) factors include:(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the offense as set forth in Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

1.    <u>Nature and Circumstances of the Offense</u>

Defendant admitted during the plea proceedings that for more than two years, she issued approximately 200 driver's licenses to foreign nationals who were either ineligible to obtain a driver's license from D.C. or did not successfully complete the examination requirements.  On most of these occasions, defendant issued the driver's licenses without requiring the customer to complete an application or present supporting documentation to verify the customer's name, date of birth, Social Security number, D.C. residency, and legal presence in the U.S.  Defendant knowingly entered false information into DMV's computer system and used her override authority to issue the licenses where the computer system's internal controls rejected the data. For example, if the Social Security number she entered failed to verify because it did not match the name or date of birth entered or was invalid, <u>i.e.</u>, the number had yet to be issued by the Social Security Administration ("SSA"), defendant overrode the system and falsely asserted in a comment box that the customer had presented a verification letter from SSA.  If a customer did not possess a Social Security number, defendant often entered "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" and made a false comment entry that a Social Security number verification was not required.  With respect to the requirement of  legal presence in the U.S., defendant falsely entered that many of these individuals were U.S. citizens.  For others, defendant elevated an individual's immigration status to lawful permanent resident and extended the expiration date of the individual's legal status significantly to avoid DMV's policy that a driver's license expires on the same day an individual's legal status in the U.S. expires. Then, defendant issued these driver's licenses for the maximum period permitted by law, that is the individual's last birthday within five years from the date the driver's license was issued.

4

Further, defendant bypassed the knowledge and road skills examination requirements by falsely entering data into the computer system that the individual possessed a valid out-of-state driver's license. Defendant knew that DMV's interstate verification process could not differentiate between driver's licenses and identification cards. Therefore, when an individual presented a valid identification card from Maryland or Virginia, defendant entered the identification card number as the individual's previous driver's license information, which obviated the need for an override. When the individual did not provide defendant with any form of identification, she often falsified an out-of-state driver's license number and made a comment entry that the interstate verification system was not working properly. On a number of occasions, defendant entered that the individual possessed a valid foreign driver's license and bypassed the knowledge test requirement by inputting bogus test results or adding a comment that the system that verified the test results was down.

Initially, defendant issued these fraudulent licenses out of sympathy. Yet, in the fall of 2006, she began accepting between $500 and $1,000 from Salvador Diaz (Cr. No. 08-139), Gloria Gonzalez Paz (Cr. No. 08-92), and a middle-aged woman named Maria, whose last name remains unknown.

2.    <u>Defendant's History and Characteristics</u>

Defendant is a naturalized U.S. citizen. She is a single mother with six minor children. Although the children's father lives nearby, he has not consistently provided the family with financial support. It is clear from the information provided to Probation Officer Linsey Epson that defendant has frequently experienced financial difficulty. Defendant was hired by the DMV in June 2002, as a Customer Service Representative. She was an exemplary employee, using her

bilingual skills often to translate for many customers who only spoke Spanish. Indeed, DMV

Director Lucinda Babers stated that defendant "was highly regarded and was often tasked to train

and assist other employees with complex DMV functions." Government Exhibit 2, p.1. Her

arrest came as a shock to many of her co-workers.

As stated previously, defendant took full responsibility for her illegal activity. Unlike

Gloria Gonzalez Paz and Salvador Diaz, she never attempted to minimize her conduct. To the

contrary, she immediately admitted her guilt and endeavored to assist the government in this

ongoing investigation. She was truly ashamed and wanted to right the wrong she had

committed.

3. <u>Seriousness of the Offense</u>

Obviously, the issuance of driver's licenses to individuals who have not met the testing

requirements creates a serious public safety hazard. Although one may sympathize with those

individuals who repeatedly failed the knowledge examination due to illiteracy, it is axiomatic

that a driver who cannot read street signs is a danger to the community. Lucinda Babers, the

Director of the D.C. Department of Motor Vehicles, explained that defendant's actions

"decreased road safety by allowing individuals onto roadways without any verification that they

were educated on safety and road knowledge." <u>See</u> Government Exhibit 2, p.3. Director Babers

referred the Court to a 2008 Allstate America's Best Drivers report that found "D.C. drivers are

84 percent more likely to be in an accident than the average driver nationally." <u>Id.</u> She further

explained that this high accident rate results in increased insurance fees, which could explain

why 20 percent of D.C. drivers are uninsured. <u>Id.</u>

The threat to road safety is beyond District lines. Driver's licenses not only grant

individuals the privilege to drive in the jurisdictions where they are issued, but permit individuals to drive throughout the nation and in many other countries. Ever Padilla (Cr. No, 08-134), for instance, was involved in two vehicular accidents, one of which resulted in the death of a pedestrian, after obtaining his fraudulent D.C. driver's license. Although the Virginia authorities found that Padilla was not at fault because the pedestrian was not in the cross walk and he had a green light, he should not have been driving at all without proving his command of the rules of the road and his ability to safely operate a vehicle. Carlos Hernandez Cruz fraudulently obtained a D.C. driver's license after Virginia revoked his Virginia driver's license. Between 1998 and 2002, Cruz had been cited for numerous driving infractions, including driving while intoxicated, speeding more than 20 miles per hour above the legal limit, and failure to obey traffic signals. The majority of the purchasers who have been identified, like Padilla and Cruz, do not reside in D.C. and are presumably spending more driving time on roads outside the District lines.

Further, at least 20 individuals who obtained fraudulent D.C. driver's licenses have surrendered them to other jurisdictions. It is customary for those jurisdictions to waive their testing requirements. Investigator H.J. Crance from the Maryland Motor Vehicle Administration explained that Maryland "does not require the out of state applicant who holds a valid license from another State to verify their identity or re-certify their driving proficiency through re-examinations." See Government Exhibit 3, p.1. Likewise, Virginia honors its reciprocity agreement with the District and "waive[s] standard knowledge and skills testing based upon the applicants' out-of-state surrenders." See Letter from SSA Daniel C. Kelly, Commonwealth of Virginia Department of Motor Vehicles (attached as Government Exhibit 4). Agent Kelly confirmed that Virginia records reflect that five individuals obtained Virginia driver's licenses

7

without taking any examinations based upon their surrender of these fraudulent D.C. licenses.

Even more disturbing, Agent Kelly found that these individuals were not eligible to obtain a

Virginia driver's license "for various reasons," which included previous driving infractions of a

serious nature, such as driving while under the influence, crashes, or reckless driving.  See

Government Exhibit 4.

   The Court is well aware that driver's licenses not only grant individuals the privilege to

drive, but "are commonly viewed and accepted world wide as a form of one's identity."

Government Exhibit 3, p.1.  "Identity is a priceless commodity," and as such, Director Babers

opined that the impact resulting from the issuance of these fraudulent licenses "cannot be fully

assessed in terms of the security of the District and our nation."  Government Exhibit 2, p.1.  It is

unknown "whether these credentials involved identity theft, a multi-billion dollar crime in the

U.S.  Further, it is unknown whether these credentials were used by criminals or terrorists

seeking to do harm to the District of surrounding community."  Government Exhibit 2, pp.1-2.

Maryland MVA Investigator Crance echoed Director Babers' concerns:

> The potential damage can be devastating and may range from the mere purchase
> of alcoholic beverages by a minor, to using the illegal license to carry out criminal
> activities or masking one's identity to enter an airport for access to aircraft
> executing a terrorist plot.

Government Exhibit 3, p.2.

   Through its investigation the government has confirmed – and anticipates finding others –

that individuals used these fraudulently issued driver's licenses to do more than just drive.

Indeed, the D.C. DMV first learned that fraudulent driver's licenses were being issued when the

Suffolk County Police Department, in New York, notified DMV's Integrity Officer that an

individual had been arrested and had a D.C. license bearing a false name.  This individual has

since been charged and pled guilty, in the U.S. District Court for the Southern District of New York, for his involvement in a conspiracy to commit armed robbery and kidnaping. See U.S. v. German Cuadrado (Cr. No. 07-387 (CLB)). Between September 2006 and January 2007, this individual was a member of an armed robbery crew, which targeted and hijacked trucks containing valuable cargo, including perfumes, cosmetic products, and cellular telephones. During the robberies, the crew brandished firearms, pistol-whipped truck drivers, and tied the drivers up with plastic flex-ties to restrain them while the trucks were offloaded. When he is sentenced, this individual could be sentenced to a maximum term of life imprisonment. Another purchaser is currently under investigation by the U.S. State Department for passport fraud. He obtained his fraudulent D.C. driver's license from defendant in an alias name. He produced the driver's license to obtain a U.S. passport. In addition using the fraudulent driver's license, this individual falsely claimed that he was born in Puerto Rico and, thus, a U.S. citizen.

Knowing the value other jurisdictions place upon the integrity of its driver's licenses and identification cards, the District has spent 45 million dollars since 2002 "to further tighten security and improve processes." Government Exhibit 2, p.2. The D.C. licensing system includes links to verify Social Security numbers and the authenticity of out-of-state licenses. Id., pp.2-3. Likewise, other jurisdictions and law enforcement agencies access D.C. DMV records to verify information, including citizenship. The majority of licenses issued by defendant were not supported by proper documentation of legal status within the U.S. Not surprisingly, ICE has confirmed that 42 individuals who obtained fraudulent licenses are not legally residing in the U.S., and of these 42, nine have previously been deported. Since defendant did not provide valid identifiers for many of the individuals who obtained fraudulent licenses, ICE was unable to find

records for 79 individuals who had obtained fraudulent D.C. driver's licenses.

As a result, the District's "reputation as a jurisdiction that only credentials citizens and legal immigrants" has been "tarnished." <u>Id.</u>, p.2. When false information is entered into an agency's database, such as the D.C. DMV, Investigator Crance explained that such information "must be purged," requiring extensive investigation and expending already depleted government resources. Government Exhibit 3, p.2. Agent Kelly estimated that the Virginia DMV will have "to invest a considerable amount of time to maintain the integrity of [its] customer data." Government Exhibit 4. This will include cancelling licenses already issued based upon the surrender of these fraudulent D.C. driver's licenses and periodic reviews when additional surrenders occur. <u>Id.</u>

By providing a two-level enhancement where the bribery relates to the issuance of government identification documents, such as a driver's license, a sentence within the guideline range is consistent with the seriousness of the offense in this case. <u>See</u> U.S.S.G. Section 2C1.1(b)(4); <u>see also</u> 18 U.S.C. Section 1028(b)(1)(A)(ii) (penalty for fraud in connection with identification documents increased from 5 to 15 years where the identification document is a birth certificate, driver's license, or identification card).

    4.    The Need to Promote Respect for the Law
<u>and Deter Similar Criminal Conduct</u>

Director Babers noted in her letter to the Court that the D.C. DMV has previously been victimized by corrupt employees. "In the past 5 years," Director Babers counted two DMV employees and four cashiers that "have been arrested and charged with illegal activities." Government Exhibit 2, p.3. Since 2000, D.C. OIG has investigated approximately 20 individuals regarding allegations of criminal conduct at the DMV. One of these investigations led to the

prosecution of DMV employee Rosa Chavez, who was charged on May 26, 2005, in a one-count Information with receipt of a bribe by a public official.  See Cr. No. 05-198 (JGP).   The nature of her criminal activity was strikingly similar to the scheme employed by defendant in this case.  Chavez input false information into the DMV database and issued facially valid driver's licenses.  Typically, Chavez worked with a middle person, who solicited individuals in need of valid driver's licenses, but who, for a variety of reasons, could not or did not want to obtain such licenses through legitimate means.  Chavez was paid a portion of the overall bribe paid to the middle person in order for her to produce the fraudulent licenses.  Chavez ultimately pled guilty.  On November 15, 2005, Judge Penn sentenced Chavez to a 24-month term of imprisonment.

Just one year later, on September 18, 2006, several individuals were charged in the U.S. District Court for the District of Maryland for conspiring to produce and transfer identification documents without lawful authority, in violation of 18 U.S.C. Section 1028(f).  See U.S. District Court for the District of Maryland (Greenbelt) Case Number 06-Cr-425(RWT).   This case also involved the fraudulent issuance of driver's licenses, albeit from the State of Maryland.  All the defendants pled guilty and received prison terms ranging from 16 to 30 months.  Id.

Clearly, defendant, the recruiters, and the individuals seeking fraudulent driver's licenses failed to learn from the results of those cases.  Despite these sentences of incarceration, criminal activity continues to flourish.  There is no doubt that, as the public official, defendant should be held to a higher standard.  She "was well aware of the impact her criminal activity would have on the [DMV] (and its employees and reputation throughout the country), the government and the nation (in terms of national security)."  Government Exhibit 2, p.4.  Even though she provided substantial assistance to the government, the imposition of a period of incarceration within the

11

applicable guideline range is necessary to promote respect for the law and deter others from the temptation of engaging in the procurement of fraudulent identification documents.

     5.    <u>The Need to Avoid Sentencing Disparities</u>

Finally, a guideline sentence will promote uniformity in sentencing.  The sentences imposed by Judge Penn in the Chavez case and Judge Titus in the Maryland DMV prosecution are comparable to the Guideline range in this case.

## III.   **CONCLUSION**

For the reasons set forth herein, the Government believes a sentence including a period of incarceration between 18 and 24 months is necessary, reasonable, and appropriate in this case.[3]

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia
D.C. Bar Number 498610


By:      _____/s/_____
SUSAN B. MENZER, D.C. Bar Number 421700
ELLEN CHUBIN EPSTEIN, D.C. Bar Number 442861
Assistant United States Attorneys
United States Attorneys Office
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530

---

[3] The statutory maximum term of imprisonment for accepting a bribe by a public official is fifteen years.  18 U.S.C. Section 201(b).  The Court may also impose a fine of $250,000 or three times the monetary equivalent of the thing of value given to the public official, an order of restitution, and a term of supervised release of up to three years if defendant is sentenced to any term of imprisonment.  As indicated in the PSR, the Court must impose a $100 special assessment regardless of the sentence imposed.  <u>See</u> PSR at ¶78.

# GOVERNMENT EXHIBIT 1
# (FILED UNDER SEAL)

# GOVERNMENT EXHIBIT 2

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**DEPARTMENT OF MOTOR VEHICLES**



OFFICE OF THE DIRECTOR

August 4, 2008

The Honorable Richard J. Leon
United States District Court for the
 District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

RE:  **United States v. Patricia Gonzalez, Cr. 08-100 (RJL) and related cases**

Dear Judge Leon:

District of Columbia Department of Motor Vehicle's (DC DMV) employee, Patricia Gonzalez, has been arrested and charged with selling credentials (i.e., driver's licenses/identification cards) to individuals who did not have the proper documentation to legally obtain a credential.  This letter serves to provide you with the impact this action had on the District and all motor vehicle jurisdictions.

As an employee, Ms Gonzalez was highly regarded and was often tasked to train and assist other employees with complex DMV functions.  She willingly violated the trust of both her co-workers and her supervisors by her illegal activities.  Her actions had a negative impact on the DC DMV, District government and other jurisdictions which count on DC to only provide credentials to individuals who meet all local and federal requirements.  As public servants, we are charged to protect and guard the resources of the residents of the District.  Ms Gonzalez not only engaged in criminal activity, but she spit on the reputation of an agency that is already the butt of late night television jokes.  At DC DMV, we have painstakingly attempted to change customer perceptions by improving service delivery.  We count on the professionalism and integrity of our employees to win the confidence and praise of our customers and other jurisdictions.  When that confidence has been violated, the entire agency pays the price of an increasingly hostile customer and law enforcement atmosphere.  This makes it increasingly difficult to deliver service to those who have no faith in either the system or its employees.  Therefore, Ms Gonzalez' actions have resulted in alienating our customers, including other jurisdictions, and increasing our wait time as we seek to first calm, and then, assist customers.

Unfortunately, the impact of Ms Gonzalez' actions cannot be fully assessed in terms of the security of the District and our nation.  In the United States, identity is a priceless commodity.  Using fraudulently obtained credentials, people have access to services and goods they are not entitled to receive such as Medicaid and alcohol.  It is also unknown whether these credentials

Page 1 of 4

involved identity theft, a multi-billion dollar crime in the US. Further, it is unknown whether these credentials were used by criminals or terrorists seeking to do harm to the District or surrounding community. Although blatant greed may have been her motivation, her actions severely compromised the security of a nation.

In 2002, DC DMV invested approximately $25 million in a state of the art driver license and camera system. In the past six years, we have enhanced the system with $20 million in upgrades to further tighten security and improve processes. The primary purpose of the system is to increase the security of our drivers licenses and identification cards. The system introduced numerous system enhancements such as unique employee profiles, enhanced management reports, advanced revenue reconciliation procedures, digital photos (including facial recognition), and both covert and overt security features on the actual credential. Although the system may be state-of-the-art, it relies on the integrity of our employees to actually utilize the system properly and comply with standard operating and issuance procedures. Ms Gonzalez, totally devoid of integrity, purposely and maliciously falsified information entered into the system and improperly used her employee profile for monetary gain.

The licensing system includes an integrated link that allows us to verify social security numbers and names directly with the Social Security Administration (SSA). Such integration allows employees the added benefit of ensuring SSN documents are authentic and that the documents belong to the person requesting the credential. Ms Gonzalez, who like most of our employees, has an in-depth knowledge of our licensing system, input erroneous SSNs, and then override the system checks to issue licenses to individuals for which the SSN and the name did not match. Such actions severely compromise our agreement with SSA to only access the system for legitimate purposes.

A recent system enhancement includes capturing in-depth information related to citizenship. Although citizenship has long been a District requirement for obtaining a credential, we did not have a means to input information such as VISA numbers. However, the enhanced version allows us to populate this information and a future enhancement will allow us to verify immigration information online using the Systematic Alien Verification for Entitlements System (SAVE). Since the District has a high immigrant population, it is critical that we only supply credentials to those who are legally allowed to have them. To accomplish this, we have centralized services with bilingual employees and access to a language line translation service, located at the DMV Service Center which Ms Gonzalez worked, available for non-Citizens. Also, other jurisdictions rely on the fact that we verify citizenship. Studies have shown that illegal immigration causes an enormous drain on District and public funds because the taxes paid by immigrants do not cover the cost of services received by them. This directly contributes to the quality of the District's education, health care, and working conditions. Although it is currently impossible for us to definitively know how many of the fraudulent credentials issued by Ms Gonzalez were to illegal immigrants, our initial analysis indicates the majority of the individuals did not have the proper documentation (i.e., SSN, birth certificate, immigration documents) to legally obtain a license in the District. Therefore, at a time with the nation is cracking down on illegal immigration, Ms Gonzalez tarnished the District's reputation as a jurisdiction that only credentials citizens and legal immigrants.

95 M Street, SW 3rd Floor, Washington, DC 20024, Office (202) 727-2200, Fax (202) 727-1010

The licensing system also includes an enhanced feature that allows us to input a customer's existing out-of-state license and verify the formatting of the state and the license number characters. This feature was implemented to add further controls to ensuring the authenticity of an out-of-state license used to convert to a District license. Individuals who convert out-of-state licenses for District licenses do not have to take the knowledge or skills test. Similar to the SSN verification, Ms Gonzalez also input erroneous out-of-state license (and identification card) information, and then overrode the system checks to issue licenses to individuals who did not take any knowledge or driving tests. Not only did this action compromise the security of the United States, but it decreased road safety by allowing individuals onto roadways without any verification that they were educated on safety and road knowledge. According to the 2008 Allstate America's Best Drivers report, D.C. drivers are 84 percent more likely to be in an accident than the average driver nationally. Therefore, Ms Gonzalez' failure to ensure individuals are skilled on road safety has a dramatically negative impact in the District. The high accident rate also contributes to the District's 20% rate of uninsured motorists; a figure that results in increased insurance fees.

In motor vehicle agencies, there is a significant street value for all documents that we produce and issue. We are well aware of the counterfeit markets thriving throughout the country. Therefore, we strive to provide our employees with training in identifying counterfeit documents. That is, documents that are created outside of the DMV to resemble authentic documents. However, Ms Gonzalez did not provide individuals with counterfeit documents; instead, she provided them with authentic District credentials that were obtained using illegal means. Such were the documents used by at least two of the 9/11 terrorists. Authentic documents are extremely difficult for other jurisdictions to identify; therefore, they are easier to convert into new licenses in other jurisdictions. Based on an internal review, at least 14 of the fraudulent documents issued by Ms Gonzalez were later converted into licenses from other jurisdictions. Unfortunately, the total number is probably significantly higher; however, motor vehicle agencies currently do not have a definitive way to track driver's license and identification cards. Therefore, we rely on the integrity of our employees.

To date, the investigation into Ms Gonzalez' unlawful activities resulted in approximately 400 man-hours of time, most of it after hours, from our Service Integrity Officer and the Director. Additionally, we estimate needing to spend another 150 man-hours, mostly using overtime, on the backend actions necessary to cancel all fraudulently issued licenses and identification cards (estimated to total 200 credentials). In total, we estimate spending approximately $29,600 on the investigation. This does not include the customer impact due to the Georgetown Service Center closing down at the time of arrest. This estimate also does not include the price the District is currently paying for law enforcement and other government agencies who may not be able to rely on the authenticity of the District's credential to investigate criminal cases or to issue credentials in other jurisdictions.

Ms Gonzalez failed to learn from the actions of past DC DMV employees. In the past 5 years, approximately two DMV employees and four cashiers (who work for the District's Office of the Chief Financial Officer) have been arrested and charged with illegal activities. Clearly, the message is not being sent, to both employees and potential customers, that criminal activity, regardless of the dollar value, will not be tolerated and that individuals caught engaging in this behavior will be prosecuted to the fullest extent of the law. As government officials, entrusted

95 M Street, SW 3rd Floor, Washington, DC 20024, Office (202) 727-2200, Fax (202) 727-1010

with taxpayers' money and the belief that we work for the common good of society, we must be held to the highest standard possible. Ms Gonzalez was well aware of the impact her criminal activity would have on the agency (and its employees and reputation throughout the country), the government and the nation (in terms of national security). Therefore, the District of Columbia Department of Motor Vehicles supports the prosecution of Ms Gonzalez to the fullest extent of the law.

Finally, it must be noted that Ms Gonzalez did not act alone. Had it not been for the recruiters and purchasers, the illegal activity would not have been able to start or flourish. All too often, we want to deflect blame from those who participate or benefit from criminal activity. However, without the constant flow of purchasers and the diligent efforts of recruiters, the majority of criminal activity in motor vehicle agencies would be non-existent. Employees cannot bribe themselves; they are often approached by outside entities, looking to exploit and devour. Therefore, it is also our expectation that the individuals benefiting from Ms Gonzalez' illegal actions, i.e., the purchasers and recruiters, be prosecuted to the fullest extent of the law.

Sincerely,

Lucinda Babers
Director

95 M Street, SW 3rd Floor, Washington, DC  20024, Office (202) 727-2200, Fax (202) 727-1010

# GOVERNMENT EXHIBIT 3

**Maryland Motor**
**Vehicle Administration**
6601 Ritchie Highway, N.E.
Glen Burnie, Maryland 21062

1-800-950-1MVA (1682)
*CUSTOMER SERVICE CENTER*

1-800-492-4575
*TTY*

www.marylandmva.com
*WEB SITE*

# oMVA
Motor Vehicle Administration

# Victim Impact Statement
# Maryland Motor Vehicle Administration and Fraudulent Licenses

TOPIC:

   The Impact on The State of Maryland /Maryland Motor Vehicle Administration (MVA) as a result of fraudulently issued District of Columbia (DC) Driver's licenses ultimately surrendered to the Maryland MVA for a valid five (5) year Maryland Driver's license.

The Maryland Motor Vehicle Administration's Operational motto is "Service, Safety and Security".

Prompt and efficient "Service" to our customers, promoting "Safety" in all of our contacts and initiatives for motorists and citizens in our State and providing "Security" by protecting our employees, our citizens, our roadways and our products in every sense of the meaning.

Corruption causing the issuance of a fraudulently issued DC driver's license that is eventually turned into a Maryland Driver's license is not just a crime it is a serious breech of public trust that rises to the level of a threat to homeland security and a clear and present danger to any law enforcement officer.

Current Maryland law supporting Maryland MVA business practice, policy and procedure does not require the out of state applicant who holds a valid license from another State to verify their identity or re-certify their driving proficiency through re-examinations. Maryland MVA processes and accepts, in good faith, the valid driver's license of out of State applicants.

Although driver licenses are essentially lawful documents certifying the privilege to drive they are commonly viewed and accepted world wide as a form on one's identity.

Fraudulently issued driver's licenses is also a form of identity fraud and one of the fastest growing crimes in the United States.

                    **Martin O'Malley** - *Governor*                    **Anthony G. Brown** - *Lt. Governor*
**John D. Porcari** - *Secretary*        **Beverley K. Swaim-Staley** - *Deputy Secretary*        **John T. Kuo** - *Administrator*

DA-092 (03-07)

Motor Vehicle agencies nationwide spend billions of tax payer's dollars to provide a secure and integrity oriented product employing the best known counterfeit measures, bar codes, holograms, security threads and more. Employees are trained to use black lights, ID scanners, document counterfeit detection devices, however, there is no known defense against a valid license issued fraudulently by a corrupt employee.

The potential damage can be devastating and may range from the mere purchase of alcoholic beverages by a minor, to using the illegal license to carry out criminal activities or masking ones identity to enter an airport for access to aircraft executing a terrorist plot.

Fraudulently issued licenses contaminate agency databases and must be purged after costly and extensive investigations often involving numerous Investigators from the agencies involved and impacted by such criminal acts.

The employees involved in such activities, often for financial gain, are adjudicated through the justice system invoking yet another chapter of costly and time consuming processes.

Investigator H. J. Crance, MVA Police Investigator
Maryland Motor Vehicle Administration

Wm. H. Donoho, Director
MVA Investigation Division
Maryland Motor Vehicle Administration

August 1, 2008

# GOVERNMENT EXHIBIT 4



# COMMONWEALTH of VIRGINIA

<table>
<tr><td>**D. B. Smit**<br>Commissioner</td><td>Department of Motor Vehicles<br>2300 West Broad Street<br>Richmond, VA 23220</td><td>**Post Office Box 27412**<br>Richmond, VA 23269-0001<br>866-DMV-LINE or<br>800-435-5137</td></tr>
</table>

August 4, 2008

The Honorable Richard Leon
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Leon,

In late May 2008 I was contacted by Susan Menzer, USADC when she requested information concerning her ongoing criminal investigation involving the fraudulent issuance of DC driver's licenses. At the time of her request, Ms. Menzer had confirmed that an employee of the DC Department of Motor Vehicles was issuing driver's licenses to individuals who were not able to legally obtain them. Ms. Menzer also knew that several of these subjects had subsequently surrendered the DC driver's licenses to other states. A review of the information provided by Ms. Menzer indicated that seventeen (17) of these individuals had established customer records with the Virginia Department of Motor Vehicles (DMV) and that five (5) of these individuals had surrendered the DC driver's licenses to assist them in obtaining Virginia driver's licenses [a class 6 felony]. Further inquiries revealed that none of the individuals were eligible to lawfully obtain Virginia driver's licenses for various reasons such as suspensions or revocations due to serious driving infractions including DUI, crashes, or reckless driving; expired limited duration licenses which are invalid for proving lawful presence; and the inability to pass the required knowledge or skills tests.

This matter has caused the Virginia DMV to invest a considerable amount of time to maintain the integrity of customer data. Licenses will be cancelled and administrative stops placed on the suspected customers' records. Additional follow-up will be required as new information and driver's license surrenders occur. The use of the fraudulent DC licenses has allowed these individuals to evade automatic license status checks through the National Driver Register (NDR) and has caused Virginia to waive standard knowledge and skills testing based upon the applicants' out-of-state surrenders. accepted as a result of driver's license compacts and reciprocity agreements. The effect upon Virginia DMV to maintain the accuracy and integrity of these customer records will be time consuming and long term.

Sincerely,


Daniel C. Kelly, SSA